## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

**United States of America,**

        **Plaintiff,**

**v.**                                                                                  **Case No. 06-20072-JWL**

**Felix Tapia,**

        **Defendant.**

## MEMORANDUM & ORDER

The indictment in this case charges the defendant Felix A. Tapia with one count of possession with intent to distribute cocaine, one count of possession with intent to distribute marijuana, one count for opening and maintaining a residence to distribute cocaine and marijuana, and the final count for knowingly and unlawfully possessing and receiving a firearm. This matter is before the court on Mr. Tapia's Motion to Suppress (doc. # 13), which challenges the validity of law enforcement officials' entry into Mr. Tapia's home, as well as the subsequent search and questioning on the morning of October 15, 2004.  Mr. Tapia argues that the entry into his home, the initial questioning, and the initial consent to search violated his rights under the Fourth and Fifth Amendments.  The court held an evidentiary hearing on the motion at which the government presented two witnesses and the defense called one.  After thoroughly considering the parties' arguments and the evidence, the court denies the motion.

### I. Findings of Fact

In October 2004, members of the Federal Bureau of Investigation's Fugitive

Apprehension Unit, a special task force, received an anonymous tip via the Crimestoppers hotline regarding Mr. Tapia.  The caller gave a physical description of him, identified his home address as 122 S. Pyle, identified his vehicles, reported that Mr. Tapia was involved in the sale of narcotics, and reported that he was a wanted felon.  The tip was faxed to Officer William Howard on October 11, 2004.  In addition to the information received by the Gladstone Police Department and given by the caller, the faxed sheet indicated that Mr. Tapia was wanted for probation violations in Wyandotte County, Kansas and Pettis County, Missouri.[1]  Officer Howard passed the information on to the FBI, and both Officer Howard and his partner from the FBI confirmed the warrants through simultaneous investigations.

At the hearing, Officer Howard testified that he and the Fugitive Apprehension Unit task force could not have gotten involved in the case unless there was a warrant.  He also explained that when a warrant is issued it is sent from the county, and it is common to confirm the warrants through the FBI's National Crime Information Center ("NCIC") system.  An NCIC report with "Bill Howard" written at the top of it and relating to Mr. Tapia was introduced into evidence and references Mr. Tapia's probation violations and warrants on page one.[2]  As further evidence that warrants existed at the time of arrest, Officer Howard pointed out that the probation violations

---

[1]The fax states, "Suspect has KCK PU [pick up] for homicide, a Wy. Co. Prob. Violation for drugs and Pettis Co. Prob. Viol. for drugs."

[2]On the NCIC report, it appears that both warrants reference Wyandotte County.  This is likely because Mr. Tapia was reporting to Kansas for his Missouri probation via an agreement with Missouri, as explained by Mr. Tapia in his Suspect Statement.  Thus, the case number for the warrant for failure to appear matches the case number for the failure to appear Missouri warrant on other forms, such as the Kansas Standard Arrest Report.

from both counties, the case numbers, and the date the violations occurred are listed on page one of the Kansas Standard Arrest Report Form, Defendant's Exhibit 402.  He also testified that a dispatcher more likely than not confirmed the warrant for the Missouri violation.  Similarly, on page 3 of the Suspect Statement, admitted into evidence as Government Exhibit # 3, Mr. Tapia acknowledged that the officers said they were at his residence for a warrant for a probation violation, that he knew about the probation violations, and that there were violations in both Kansas and Missouri.

The government, however, did not present a copy of the arrest warrant at the hearing and officers did not have a copy physically present at the time they entered the residence. Officer Howard testified that he could not conclusively remember if he had ever seen a copy of the actual warrant, but that it was likely in the file at the office.  The defense's witness was Officer William Johnson, a task force officer on the day in question, who wrote a Report of Investigation.  (Defendant's Exhibit # 401).  He wrote that after receiving the anonymous tip, the Fugitive Apprehension Unit "determined that TAPIA had an active *parole* violation warrant out of Wyandotte County." (Emphasis added).  The defense pointed out that this is different than a *probation* violation as evidence that no warrant existed.  Officer Johnson responded that it was likely a mistake in his report and that probation and parole are often used interchangeably amongst law enforcement officials.  He also testified that he had not seen hard copies of the warrant.

On October 15, 2004, at approximately 7:15 a.m., Officer Howard led the task force to the residence address previously identified by the caller.  A vehicle that the caller described, a

3

green El Camino, was in the driveway.  After knocking on the front door with no answer, the officers showed a picture of Mr. Tapia to a neighbor, who said that the man pictured lived at 122 S. Pyle and drove the El Camino.  The officers returned to the front door of 122 S. Pyle and pounded on the door, demanding Mr. Tapia to open it.  Mr. Tapia looked out the window near the front door, at which point he was identified by officers.  When Mr. Tapia retreated from the window and did not open the door, Officer Howard kicked down the door and entered with approximately nine other officers, who had weapons drawn.  Mr. Tapia presented himself and was handcuffed behind his back.

Shortly afterwards he was escorted outside to Officer Howard's vehicle. Only Officer Howard, dressed in clothes identifying him as an officer with a badge and hat, and Mr. Tapia were in the vehicle.  Mr. Tapia was dressed lightly, in boxer shorts and socks, and indicated to the officer that he was cold.  Officer Howard said that the tension from the arrest had waned, and they were cordial while talking in the back of the vehicle.  Officer Howard asked Mr. Tapia if the officers could search his house, to which he gave oral consent and then also stated that bricks of marijuana could be found under his fish tank.  Officers began to search, and Officer Howard contacted the narcotics unit to alert them that he had received oral consent to search. Mr. Tapia was taken back inside his house and allowed to put on additional clothing.  Officer Howard retrieved a written search consent form from his car.  The officer explained the form to Mr. Tapia and told him he could remain in the home and call off the search at anytime.  Mr. Tapia

signed the form at 7:30 a.m. indicating his consent.[3]

Mr. Tapia remained in the house for the duration of the search.  He was re-handcuffed to the front and was allowed to drink fluids, use the restroom, and smoke.  He was also permitted to converse with his family and girlfriend.  Officer Howard also spoke to Mr. Tapia inside the house and indicated the interaction was lighthearted and that Mr. Tapia expressed his gratefulness for how he was treated.  Mr. Tapia also told the officer no money would be found and identified white powder found by a weight bench as cocaine.  No threats or promises were made throughout Officer Howard's interaction with Mr. Tapia.

Detective Greeno with the narcotics enforcement unit arrived about 9:00 a.m at Mr. Tapia's residence.  He first met with Officer Howard for a briefing on the preceding events.  Detective Greeno was in plain clothes, not a police uniform, with no weapon visible.  He then met with Mr. Tapia in a room away from other officers, and Mr. Tapia was calm, cooperative, and even said that he was glad that this had happened.

Mr. Tapia signed a waiver of his rights, which included a list of his Miranda rights. His name, date of birth, last grade of school completed (10th grade), and that he had obtained a GED in 1997 was written at the top of the form by the detective. Detective Greeno also confirmed that Mr. Tapia could read by having him read the first line aloud.  Mr. Tapia's initials are next to the

---

[3]The form authorized the officers of the Kansas City Police Department to conduct a search of Mr. Tapia's residence for drugs and money throughout the entire interior of the home.  It was later added by Detective Greeno, another government witness who came to the residence around 9:00am, that the search was to include the green El Camino parked in front of the house.  Mr. Tapia initialed this addition.

listed Miranda rights. Mr. Tapia then read the statement under "Waiver of Rights," of which the

last line states, "No promises or threats have been made to me and no pressure or coercion of any

kind has been used against me." Furthermore, "coercion" is circled. Detective Greeno testified

that he circled this word because he further explained it and made sure Mr. Tapia understood its

meaning. The detective felt that Mr. Tapia understood the form, and Mr. Tapia agreed to talk

to him. Detective Greeno questioned Mr. Tapia at his house immediately following the signing

of the waiver, and he also followed up with a second statement at 11:40 a.m. at the Special

Enforcement Unit Office to discuss items not covered in the first interview, which lasted about

thirty minutes. (Transcript of "Suspect Statement," Government's Exhibit #3).

## II.  Analysis

### A.      Entry of Residence Pursuant to Arrest Warrant

Mr. Tapia argues that officers entered his home without a warrant, which constitutes a

presumptively unreasonable search or seizure. Under *Payton v. New York*, 445 U.S. 573 (1980)

a warrantless entry into a home is presumptively unreasonable, but law enforcement officers may

enter a home to execute a valid arrest warrant when the officers can "demonstrate a reasonable

belief that the arrestee lived in the residence, and a reasonable belief that the arrestee could be

found within the residence at the time of entry." *Valdez v. McPheters*, 172 F.3d 1220, 1224

(10th Cir. 1999). Under this standard and the facts previously presented, there are several issues

before the court. Relevant to executing "a valid arrest warrant," the issues are whether there was

a valid arrest warrant, whether the officers had to physically possess that warrant at the time of

entry, and whether the officers may rely only on the warrant itself as opposed to other

information confirming the existence of that warrant.  Under *Payton*'s two prongs, the issues are

whether there was a reasonable belief that Mr. Tapia lived at 122 S. Pyle and that he was there

at the time the officers entered.  Each is discussed in turn, and the court concludes the entry into

Mr. Tapia's home was lawful.

**1. There was sufficient evidence to prove the existence of an arrest warrant for Mr.**

**Tapia**.

In the memorandum supporting the motion, Mr. Tapia stated that "the officers had no

warrant, although they believed there was a fugitive warrant for Tapia from Wyandotte County."

Memorandum in Support of Defendant's Motion to Suppress Statements and Items Seized, at

3.  At the hearing, the government did not produce a copy of or the actual warrant.  Mr. Tapia,

through counsel, then argued to the court that there was insufficient proof to establish there was

a warrant, showing this was a warrantless entry.  It is unknown to the court why the government

did not produce the warrants at the hearing, which would have been the best practice, or ask for

a continuance to do so.  Despite this, under the particular facts of this case, the court concludes

that the evidence is sufficient to establish the existence of the warrants.

"[T]he controlling burden of proof at suppression hearings should impose no greater

burden than proof by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164,

178 (U.S. 1974), citing *Lego v. Twomey*, 404 U.S. 477, 488-489 (1972); *see also United States*

*v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001).  Because Mr. Tapia challenges the

search as warrantless, the government  must prove a valid arrest warrant existed.  *See generally*

*United States v. Maestas*, 2 F.3d 1485, 1491 (10th Cir. 1993) ("[I]f the police acted without a

warrant the burden of proof is on the prosecution.") (internal quotations omitted); *see also United States v. Pratt*, 438 F.3d 1264, 1270 (11th Cir. 2006), *cert. denied Pratt v. United States*, 126 S.Ct. 2052 (2006) (explaining that when a search warrant is lost before the suppression hearing, "[t]he Government does not need to prove the warrant's existence with certainty, but rather by a preponderance of the evidence."). The government must prove by a preponderance of the evidence that an arrest warrant naming Mr. Tapia had been issued. A similar situation was discussed in *United States v. Burkhart*, 347 F.2d 772, 774 (6th Cir. 1965). "Appellants rely upon the government's failure to present the arrest warrant at the time of trial as proof that no such warrant existed. But the government's witnesses testified that they did have the warrant at the time of the arrest and the United States Commissioner testified that he had issued it. The Court was not in error in resolving this question of fact on the hearing of the motion to suppress, in favor of the government's contention." *Burkhart*, 347 F.2d at 774; *see also Pratt*, 438 F.3d at 1270 (in the context of a missing search warrant the court held "that *other evidence* of a search warrant's existence and descriptive language may be used in a suppression hearing to prove that a search was conducted with a warrant. . . .We decline to accept [the defendant's] suggestion that the absence of a search warrant at a suppression hearing creates a presumption that there is a Fourth Amendment violation."). Therefore, evidence other than the arrest warrant itself can be sufficient to establish that a warrant existed.

There was proof by a preponderance of the evidence that a warrant existed at the time officers entered Mr. Tapia's home. This court relies on Mr. Tapia's Suspect Statement, in which Mr. Tapia himself admitted to knowing of the outstanding warrants and probation violations in

both Kansas and Missouri just hours after he was arrested. Officer Howard also testified there were warrants for Mr. Tapia's arrest, and upon careful scrutiny, the court determines the testimony credible. Additionally, the NCIC report, the standard arrest report form, and the fax, all of which reference the probation violations, corroborates Officer Howard's testimony and leads this court to the conclusion that a warrant existed at the time of entry. The court cannot conclude that because the government was remiss in not introducing the warrant into evidence, it should ignore this "other evidence."

In response to the evidence presented by the government to satisfy its burden to prove that warrants existed, the defense provided little evidence to refute it. The defense presented nothing to show that the NCIC report or the fax were incorrect, nor that Officer Howard was not credible. In fact, the statement by Mr. Tapia in the Suspect Statement corroborated the government's witnesses' testimony. The defense pointed only to Officer Johnson's use of "parole violation warrant," as opposed to "probation," and the absence of the warrant at the hearing as proof that it did not exist. This court does not find convincing that the use of the word "parole" instead of "probation" is sufficient to refute the government's evidence that proved the existence of the warrant by a preponderance of the evidence. Furthermore, the court agrees with the reasoning in *Burkhart* that the failure of the government to introduce the warrant at the hearing is insufficient to prove there were no warrants when other evidence establishes the warrants did exist. Therefore, the government satisfied its burden and Mr. Tapia was unable to rebut it.

**2. There is no requirement to physically possess the arrest warrant at the time of**

**entry to execute a warrant.**

Federal Rule of Criminal Procedure 4(c)(3) provides for the manner in which an arrest warrant should be executed.  "A warrant is executed by arresting the defendant. Upon arrest, an officer possessing the warrant must show it to the defendant. If the officer does not possess the warrant, the officer must inform the defendant of the warrant's existence and of the offense charged and, at the defendant's request, must show the warrant to the defendant as soon as possible." Fed. R. Crim. Pro. 4; *see also Valdez v. McPheters*, 172 F.3d 1220, 1224 (10th Cir. 1999) (stating that a circumstance permitting officers to enter a home is the "*existence* of a valid arrest warrant," not possession (emphasis added)).  "[U]under neither federal statutory law, nor under Constitutional law are [officers] required to possess the arrest warrant at the time of arrest. . . .As long as the officers have reliable knowledge of the existence of a warrant for the defendant's arrest, no more is necessary to effectuate the arrest." *Trapp v. United States Marshals Service*, 2005 WL 3179471, *7 (D. Kan. Nov. 7, 2005), citing *Lewis v. Nelson*, 1997 WL 291177, *3 (10th Cir. 1997) (unpublished table opinion) (holding there is no right that arrest warrant must be present at time of arrest); *United States v. Buckner*, 717 F.2d 297, 301 (6th Cir. 1983) ("The police . . . did have reliable knowledge of a state bench warrant for the defendant's arrest . . . No more was necessary. The fact that the officers did not have the arrest warrant in hand is of no consequence.").[4]  Mr. Tapia admitted in his Suspect Statement that officers did

---

[4]The court acknowledges that these and other subsequently cited cases are civil cases, whereas Mr. Tapia's is a criminal case with his liberty at issue.  The civil cases, however, discuss the same Fourth Amendment prohibition against unreasonable search and seizures that is at issue in Mr. Tapia's case.  While in different contexts in which remedies and

inform him of the existence of the warrant, and there was no evidence indicating that he requested that it be shown to him. *See generally Smyth v. City of Lakewood*, 1996 U.S. App. LEXIS 8773 (10th Cir. Apr. 19, 1996) (noting that according to the defendant's version of the events, it was clear that the officer knew of the outstanding warrant). There is no requirement for the arrest warrant to be physically present when executing the warrant. Therefore, the officers did not unlawfully enter Mr. Tapia's home to arrest him merely because that arrest warrant was not physically present at the residence with them.

**3. Officers may reasonably rely on routine police procedures to confirm the existence of a warrant.**

After determining the entry was not warrantless and the officers did not have to possess that warrant when they entered the home, the issue is then whether officers violated Mr. Tapia's constitutional rights by verifying the warrant through routine police procedures rather than

---

available exceptions may differ, this inquiry in both types of cases is the same–whether officers violated an individual's Fourth Amendment rights. Therefore, when it is discussed in the context of civil cases whether officers performed an illegal search or seizure, the same reasoning can be applied in determining whether a search or seizure was unlawful within the context of a motion to suppress. This is consistent with cases such as *Allen v. McCurry*, 449 U.S. 90 (1980), which held that when a state court denied a motion to suppress after determining the police's conduct was legal under the Fourth Amendment, that claim could not be relitigated in federal court through a 42 U.S.C. § 1983 claim against the officer who seized the evidence in question. This was because the state court had "given the parties a full and fail opportunity to litigate the federal claims," and "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen*, 449 U.S. at 94. The Court, therefore, implicitly recognized that the issue of whether there was a Fourth Amendment violation that was decided in a motion to suppress could be the same as the Fourth Amendment claim at issue in a civil case.

viewing and confirming the warrant first-hand.[5]  The officers were entitled to rely on the NCIC

report and other routine procedures that gave them reliable knowledge that an arrest warrant

existed at the time of entry.  *Hill v. Brogans*, 735 F.2d 391, 393 (10th Cir. 1984) (officer "acted

reasonably in relying on routine police procedures for establishing the existence of an

outstanding warrant"); *Smyth v. City of Lakewood*, 83 F.3d 433, 1996 WL 194715, 1996 U.S.

App. LEXIS 8773, *11 (10th Cir. Apr. 19, 1996) (unpublished table opinion) ("An officer on

the highway is entitled to rely on an accurate computer notification that there is an existing

warrant for an individual's arrest.  The officer is not required by the Fourth Amendment to

obtain a copy of the warrant, research supporting documentation, or go behind the facial validity

of a warrant before making the arrest."); *see also Whitely v. Warden*, 401 U.S. 560 (1971) ("We

do not, of course, question that the . . . police were entitled to act on the strength of the radio

bulletin"); *Capone v. Marinelli*, 868 F.2d 102 (3d Cir. 1989) (officers entitled to rely on NCIC

bulletin to establish the existence of an arrest warrant); *Buckner*, 717 F.2d at 301 (reliable

knowledge sufficient to execute an arrest warrant); *Loughridge v. City of Norman*, 2007 WL

2079833, 2007 U.S. Dist. LEXIS 51518 (W.D. Okla. July 16, 2007) (concluding that because

Mr. Loughridge did not identify any evidence which at the time of arrest should have given the

officer any reason to suspect the validity of the NCIC report showing an outstanding arrest

---

[5]The court does not reach the issue that if the search was warrantless and in violation
of Mr. Tapia's rights under *Payton*, whether reasonably relying on routine police procedures
and information would qualify under the good-faith exception to prevent the suppression of
the evidence.  Because there was a warrant, the decision here pertains only to whether the
specific action of verifying warrants through routine methods violated Mr. Tapia's rights.

warrant, no unconstitutional conduct was shown); *Wysinger v. White*, 1998 U.S. Dist. LEXIS 6431 (D. Kan. Apr. 28, 1998) (where "NCIC check revealed an outstanding felony warrant," the officer acted properly, and Wysinger failed to show that the officer violated his constitutional rights).

Evidence at the hearing established officers acted reasonably in confirming the existence of Mr. Tapia's warrants and seizing him according to that information.  The evidence includes: the NCIC report that indicated there were two warrants for Mr. Tapia's arrest, information on the fax sheet indicating outstanding warrants, and  Officer Howard's testimony that he and another FBI agent confirmed the existence of the warrants prior to the arrest. From a practical standpoint, when warrants are issued in jurisdictions other than where an arrest is made, it likely is not often possible for law enforcement officers to efficiently obtain and view a copy of or the actual warrant before making the arrest. *See generally United States v. Smith*, 131 F.3d 1392, 1397-98 (10th Cir.1997) ("[W]here state officers are arresting a person within their state, neither precedent nor logic requires a second arrest warrant to be obtained when a valid warrant has been issued in another state.").  Also, the defendant pointed to no authority and the court finds none that indicates relying on routine police procedures to establish that an arrest warrant exists, as opposed to viewing or possessing the warrant itself, before entering a residence to execute that arrest warrant violates a person's constitutional rights.  To the contrary, several courts within this Circuit have found no constitutional violation occurs where an arrest is made based upon reasonble confirmation of information through the NCIC and other routine methods.  The court finds no occasion to depart from this reasoning in the context of entry into a home to execute an

13

arrest warrant.  Therefore, the officers did not perform an "unreasonable search or seizure," as prohibited by the Fourth Amendment, by reasonably relying on routine police procedures to verify the arrest warrants.

### 4.  The requirements of *Payton* were satisfied and justified entry into Mr. Tapia's residence.

The court next evaluates whether the entry to the home pursuant to that arrest warrant was constitutional.  Although searches and seizures inside a home without a search warrant are presumptively unreasonable, "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton*, 445 U.S. at 603.  The government has the burden of proving that the officers had a reasonable belief that Mr. Tapia lived at 122 S. Pyle and that he was there at the time they entered.  *Id.*; *Valdez v. McPheters*, 172 F.3d 1220, 1224 (10th Cir. 1999).  The evidence clearly establishes both *Payton* prongs are satisfied.

Under the first prong of the *Payton* test, the court finds that the officers reasonably believed Tapia lived at 122 S. Pyle. The anonymous caller first gave the address to authorities. In addition, the vehicle described by the caller as Mr. Tapia's was in the driveway.  Furthermore, a neighbor, looking at a picture of Mr. Tapia, identified that he lived in the house and drove the vehicle that was in the driveway.  Therefore, there is sufficient evidence to establish officers had a reasonable belief that Mr. Tapia lived at the residence.

The analysis of the second prong is straight-forward.  At the hearing, there was uncontradicted evidence that Mr. Tapia appeared at the window when the officers were at the

14

door.  Officer Howard testified that he saw Mr. Tapia and was able to identify him, thereby giving the officers more than a reasonable belief that Mr. Tapia was at the residence when they entered.  There was sufficient evidence to establish that officers reasonably believed Mr. Tapia was at the house at the time the officers entered.

Because the *Payton* test is satisfied, officers acted lawfully in entering the home to apprehend Mr. Tapia.  There was no constitutional violation in entering Mr. Tapia's home, so the exclusionary rule is inapplicable and the motion to suppress on this basis is denied.

## B.    Initial "Questioning"

Mr. Tapia, in his memorandum supporting his motion, alleged that he was asked whether he "had anything."  He made a statement that there was marijuana under his the fish tank in his home.  At the hearing the uncontradicted testimony established that this was a spontaneous statement.  There was no evidence that he was asked whether he had anything, but instead the statement was made after he consented to a search of his home.  It was not in response to any question or a functional equivalent thereof.  *Miranda v. Arizona*, 384 U.S. 436 (1966), applies only to custodial interrogations.  Although Mr. Tapia was in custody, there was no interrogation, which is "questioning initiated by law enforcement officers . . . ".  *Id.* at 144; *United States v. Davis*, 40 F.3d 1069, 1078 (10th Cir. 1994) ("*Miranda* applies only if an individual is subject to either express questioning or its functional equivalent.").  The statement about the marijuana was not the result of an interrogation but rather a spontaneous utterance that did not trigger an obligation to administer *Miranda* warnings.  Thus, no violation of Mr. Tapia's rights was shown, and the motion to suppress on this basis is denied.

15

**C.       Voluntariness of the Consent to Search the Residence**

The court turns, then, to Mr. Tapia's final argument that his oral consent to search his residence was involuntary due to coercion. The consent that Mr. Tapia challenges is the initial oral consent to search his residence while he was still in Officer Howard's vehicle. Officer Howard testified that he asked Mr. Tapia if they could search his home, and Mr. Tapia gave his permission. Under the Fourth and Fourteenth Amendments a search conducted without a warrant issued upon probable cause is per se unreasonable, subject only to a few specific exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). A search authorized by consent is valid and is a well-recognized exception to the prohibition against warrantless searches. 412 U.S. at 219. Consent is valid only if it is freely and voluntarily given. *United States v. Cruz-Mendez*, 467 F.3d 1260, 1265 (10th Cir. 2006). The voluntariness of consent, which the government has the burden of proving by a preponderance of the evidence, is a factual issue based on the totality of the circumstances. *United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007). Two conditions must be met for consent to be valid: "(1) There must be a [sic] clear and positive testimony that consent was unequivocal and specific and freely given; and (2) The government must prove consent was given without duress or coercion, express or implied." *Id.* (quotations omitted); *see also United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir. 2006) (distinguishing consent given as an "essentially free and unconstrained choice" from one given as the product of duress or coercion). The court finds that the government has carried its burden.

Here there is no question that Mr. Tapia consented to the search and that the consent was specific. Officer Howard asked Mr. Tapia if the officers could search the house, and Mr. Tapia

responded by giving the officers permission to search.  There was no evidence presented at the hearing to the contrary, and Mr. Tapia did not challenge this in his motion or supporting memorandum. Thus, the issue is whether the consent was the result of duress or coercion.

The government also proved that Mr. Tapia's consent was given without duress or coercion.  "In determining whether a consent to search is voluntary, a court should consider the following: physical mistreatment, use of violence or threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant." *United States v. Glover*, 104 F.3d 1570, 1583-1584 (10th Cir. 1997); *see also United States v. Guerrero*, 472 F.3d 784 (adding the relevant factors, "interaction in a nonpublic place or a small, enclosed place; and absence of other members of the public").

Mr. Tapia was in custody at the time of consent, but a person being detained can give voluntary consent to search. *United States v. Mendez*, 118 F.3d 1426, 1432 (10th Cir. 1997). A defendant must still prove consent was given as a result of duress or coercion despite being in custody. *Id.* "The fact that officers do not specifically inform an individual that he or she has the right to refuse to consent to a search does not render that search coercive," but it is a factor to be considered. *See United States v. Davis*, 40 F.3d 1069, 1078 (10th Cir. 1994). Thus, even though there was no evidence that Mr. Tapia was told that he could refuse consent, the court does not find that factor outweighs the other evidence discussed below that satisfies the government's burden.

While the initial entry into the home was aggressive and likely intimidating, that was not the situation when Mr. Tapia consented to the search of his residence.  Officer Howard testified

that the atmosphere was cordial with Mr. Tapia, which was corroborated by Mr. Tapia's statements in his Suspect Statement that the officers treated him "real nice" and that he gave the officer permission to search the house.  Suspect Statement, at 4.   No aggressive demands were made, nor were there any threats or promises made to induce Mr. Tapia's consent. The consent was given in Officer Howard's car, where he was the only officer present and no weapons were drawn.  While this is a small and enclosed space without other members of the public, the court concludes based on Officer Howard's uncontradicted testimony that it was not an intimidating environment.  Also, it was a cold morning and likely a more comfortable alternative to standing outside for both Mr. Tapia and the officers.

It does cause the court mild concern that the consent was received while Mr. Tapia was dressed only in boxers and socks on a cold morning, possibly altering an ideal physical condition.  Mr. Tapia, however, was not outside or in the car for a significant period of time. This is evident based on the testimony that officers arrived at his home around 7:15 a.m., went through several steps before initially entering the house, and he signed the consent to search form at 7:30 a.m., after Mr. Tapia gave his oral consent in Officer's Howard's car.[6]  Plus, because he was in the vehicle, the court does not find the embarrassment of being in his boxer's in public or the cold weather coerced him into consenting.

_____

[6]Mr. Tapia's counsel pointed out that the consent to search form was available to Officer Howard at the time the oral consent was obtained, so he should have used the form. He pointed to no authority for this proposition, and in fact, the court finds that Mr. Tapia's signing of the consent to search form, like the fact that he did not call off the search, further corroborates that he understood that he was consenting to search.

18

Mr. Tapia was also told at the time of signing the consent form that he could refuse consent, be present for the search, and call off the search at anytime. While not dispositive as to whether the initial oral consent was voluntary, the fact that Mr. Tapia knew he could call off the search shortly after that initial consent but never did is evidence he consented voluntarily. *See United States v. Guerrero*, 472 F.3d 784, 790 (10th Cir. 2007) ("The district court also notes that neither Defendant objected during the search itself, which, while not dispositive, is often a good indicator that consent existed."). The court also determines based on the evidence that because Mr. Tapia can read, obtained his GED, and is of adult age, he had the mental capacity to consent. The court finds that based on the totality of the circumstances, Mr. Tapia's consent was given free of duress and coercion. The motion to suppress is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that Mr. Tapia's motion to suppress (doc. # 13) is denied.

**IT IS SO ORDERED** this 13th day of November, 2007.


s/ John W. Lungstrum
John W. Lungstrum
United States District Judge

19